AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)     ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
**04/20/2022**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

**FILED**
CLERK, U.S. DISTRICT COURT
**04/20/2022**
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America

v.

WILLIAM EDWARD DICK, JR.,

Defendant.

Case No. 8:22-mj-00284-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of October 24, 2021 in the county of Orange in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1), (b)(1)(C) | Distribution of Fentanyl Resulting in Death |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____/s/_____
*Complainant's signature*

Steven N. Levin, Special Agent, DEA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:     April 20, 2022

*Judge's signature*

City and state:   Santa Ana, California

Hon. JOHN D. EARLY, U.S. Magistrate Judge
*Printed name and title*

AUSA: B. Marrett (x3505)

## AFFIDAVIT

I, Steven N. Levin, being duly sworn, declare and state as follows.

### I.   PURPOSE OF AFFIDAVIT

1.   This affidavit is made in support of a criminal complaint and arrest warrant for William Edward DICK Jr. ("DICK") for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C): Distribution of Fentanyl Resulting in Death.

2.   The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### II.   BACKGROUND OF AFFIANT

3.   I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), and have been so employed since March 2020.  I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7).  I am empowered to conduct investigations of, and to make arrests for, federal felony offenses enumerated in 18 U.S.C. § 2516.

4.   I am currently assigned to the Los Angeles Field Division ("LAFD"), Orange County District Office ("OCDO"), in Santa Ana, California, and my responsibilities include

investigating large-scale drug trafficking organizations
operating in the Southern California area and elsewhere.  During
the course of my employment, I have received approximately 300
hours of specialized training at the DEA Academy in Quantico,
Virginia, on drug identification, detection, and interdiction,
money laundering techniques, conspiracy investigations, and
asset identification, seizure, and forfeiture.

5.   I have participated in investigations that involve one
or all of the following crimes: possession, distribution,
possession with intent to distribute, and manufacture of
controlled substances, as well as distribution of controlled
substances resulting in death.  Based on my training and
experience, my conversations with other law enforcement
personnel, and my own participation in this investigation, I am
also aware of the tactics and methods employed by individuals
involved in drug trafficking organizations to avoid detection by
law enforcement, including the use of: multiple wireless
telephones, pre-paid cellular telephones, cloned communication
devices, debit calling cards, public pay telephones, counter-
surveillance techniques, false or fictitious identities, coded
and ambiguous language in conversations, multiple vehicles, and
vehicles with concealed compartments.  I am aware that drug
traffickers drop or switch telephones and/or telephone numbers
frequently to thwart law enforcement investigation of their
criminal activities.  I am further aware that drug traffickers
use wireless telephones subscribed in the names of other
individuals, often times their spouses or other family members,

to avoid law enforcement detection.  Based on my training and
experience, I have found that it is common for narcotics
traffickers to obtain, maintain, and use firearms in order to
protect their narcotics and narcotics proceeds, and that the
cellphones they use have high call volume from a variety of
telephone numbers.

6.   I have executed numerous search warrants to seize
evidence of violations of federal and state law, as well as
arrest warrants to apprehend individuals who have committed such
violations.  Additionally, I have led and participated in
numerous investigations and operations to detect and combat the
importation, trafficking, distribution, and sales of drugs.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

7.   Based on my training and experience, investigation in
this case, review of investigative reports, and debriefings with
law enforcement officers, I am aware of the following:

8.   On the evening of October 24, 2021, E.H. was looking
to purchase cocaine to entertain friends.  D.N. instructed E.H.
to contact William Edward DICK Jr. ("DICK"), who, later that
evening, delivered approximately $200 dollars worth of cocaine
to E.H. at 106 ½ Diamond Avenue, Newport Beach, California ("the
Diamond Avenue Residence").  The cocaine that was delivered by
DICK contained fentanyl and was ingested by E.H., S.H., A.A.,
and D.A. at some point in the evening.

9.   On October 25, 2021, E.H. awoke and found S.H., A.A.,
and D.A. deceased.  Newport Beach Police Department ("NBPD")
responded to the Diamond Avenue Residence and began an

investigation into the overdose deaths.  In the course of the
NBPD investigation, investigators executed several California
state search warrants for among other things, cellular
telephones found at the Diamond Avenue Residence as well as a
search warrant at DICK's residence.  At DICK's residence
investigators seized cocaine, fentanyl, and packaging material
that was consistent with what was recovered at the Diamond
Avenue Residence.

### IV.   STATEMENT OF PROBABLE CAUSE

10.  I have reviewed police reports related to this
investigation, provided by NBPD Detective Kyle Markwald.  Based
on my review of the reports and conversations with Detective
Markwald and others, as well as my own participation and
observations throughout the investigation, I have learned the
following facts:

**A.   Suspected Triple Overdose Deaths of S.H., A.A., and D.A.**

11.  On February 4, 2022, I reviewed NBPD reports written
by Detective Kyle Markwald and Officers J. H. Khor, J. Moberg,
and C. Grange, all dated October 25, 2021.  Based on my review
of the reports, I am aware, in relevant part, of the following:

*a.   E.H. Reports Overdoses to NBPD*

12.  On Monday, October 25, 2021, at approximately 8:23
a.m., E.H. called 9-1-1 to report that his three friends were
"not waking up."  NBPD officers and Newport Beach Fire
Department ("NBFD") personnel arrived on scene and found four
victims inside the Diamond Avenue residence.  Three victims,
S.H., A.A., and D.A., were pronounced deceased at approximately

8:26 a.m., and the fourth, E.H., was transported to Hoag Hospital for emergency care.[1]

>   b.   ***October 25, 2021 Interview of E.H.***

13.   Detective Markwald arrived at Hoag Hospital at 9:10 a.m. and met with E.H. in Room #23 in order to obtain a statement from E.H.   E.H. was not handcuffed and Detective Markwald explained to him that he was not under arrest.   During the interview, E.H. received medical care, appeared to be shaken emotionally and mentally, and was talking softly and at a very low volume.[2]   The interview was audio recorded.   In relevant part, E.H. made the following statements:

>   a.   E.H. stated that on Sunday, October 24, 2021, at approximately 2:00 p.m., he and his wife, S.H., came to Newport Beach to visit their friends A.A. and D.A., who were staying at the Diamond Avenue Residence.   The two couples went to dinner in Newport Beach.   E.H. stated all four of them consumed alcoholic beverages while out for dinner, but that no drug use had taken place that he was aware of.

>   b.   E.H. stated the group returned to the Diamond Avenue Residence at approximately 5:00 p.m. and continued to drink alcoholic beverages.   At approximately 9:00 p.m., E.H.

---

[1] On January 28, 2022, I participated in a conference call with Dr. Shaun Carstairs, M.D., a medical toxicologist who has been retained by the DEA to provide an independent opinion on the cause of death for S.H., A.A., and D.A.   Dr. Carstairs had previously been provided medical examiner reports for the deaths of S.H., A.A., and D.A.   Dr. Carstairs opined that all three deaths were the result of acute fentanyl poisoning.

[2] Based on my review of NBPD reports provided by Detective Markwald, Officer J. H. Khor, who was present during the interview, noted that E.H. was exhibiting symptoms of drug use.

called a male he knows as "Brian" and ordered $200 worth of
cocaine.  E.H. stated he had purchased cocaine from "Brian" in
the past on several occasions and had never had a problem
before.  Between approximately 9:30 and 9:40 p.m., "Brian"
arrived at the residence with what E.H. believed was cocaine.
E.H. stated "Brian" provided him with a white powdery substance
and told him it was cocaine.

      c.   E.H., S.H., A.A., and D.A. all began snorting
cocaine while they drank alcohol and "partied."

      d.   E.H. did not observe "Brian" ingest any cocaine.
E.H. was unsure how long they were awake or how much of the
powder he or anyone else had ingested.  E.H. stated he began to
feel tired, so he laid down in the room where everyone was
sitting.

      e.   E.H. stated the next thing he remembered was
waking up at an unknown time on Monday morning and noticed
"Brian" getting up around this time and heard him moving items
around in the house before "Brian" left through the front door.
E.H. was unsure if he had fallen asleep after hearing "Brian"
leave or how much time passed before he sat up again and noticed
S.H., A.A., and D.A. were unresponsive.  E.H. then called 9-1-1.

      f.   E.H. was positive nobody produced any illegal
controlled substances at any time during the night other than
drugs "Brian" provided.  E.H. stated the entire group only used
cocaine and marijuana on occasion.  Detective Markwald asked
E.H. if he observed anyone in the residence ingest any

substances through injection, smoking, or eating, and E.H. stated he did not.

g.   E.H. stated "Brian" was an acquaintance he had purchased cocaine from in the past.  E.H. was not sure what "Brian's" last name was or where he lived, but believed "Brian" drove a Ford Explorer.  E.H. described "Brian" as a white male adult who was approximately 45 to 55 years old.  E.H. told Detective Markwald he contacted "Brian" using his cellular phone ("**SUBJECT DEVICE 1**") and had arranged the purchase and delivery via call and text messages.  E.H. stated that "Brian's" phone number was saved in his phone.  E.H. consented to a search of **SUBJECT DEVICE 1** and provided Detective Markwald "Brian's" contact information.

### c.   *Responding Officers' Observations of Overdose Scene — 106 ½ Diamond Avenue, Newport Beach*

14.   Detective Markwald then went to the Diamond Avenue Residence and spoke with Officers Moberg and Grange, who were the first officers to respond to the 9-1-1 call.  Officers Moberg and Grange arrived on scene and walked up the stairs that lead to the front door of the Diamond Avenue Residence, which is the only access point for the residence.  Officers found the front door ajar and could see E.H. lying on the ground as well as the bodies of three other people.  Responding emergency personnel entered and verified the three people inside (S.H., A.A., and D.A.) were all deceased.

15.   When Detective Markwald walked through the front room of the apartment and observed the bodies of the decedents, he

recognized their body posturing as consistent with death caused by an overdose.  Detective Markwald did not see any obvious signs of trauma, did not see any visible injuries, and observed there were no signs of a physical struggle.

16.  On the coffee table in front of the couch, there were three cellular phones.  The first phone was a black Apple iPhone 8, **SUBJECT DEVICE 1,** in a clear case and had a lock screen picture with three colors showing.  The second phone was a grey iPhone 12 in a clear case with a lock screen picture of the ocean, **SUBJECT DEVICE 2**.  The third phone was a white iPhone 12 with a lock screen picture of a yellow balloon shape and red amoeba shape, **SUBJECT DEVICE 3.**

17.  Detective Markwald continued the walk through and saw what he recognized as paraphernalia used to ingest controlled substances on the peninsula style cabinet countertop separating the kitchen and the room where the three decedents were found. On the counter was a cylindrical section of pen that was approximately five inches long and there was a white powdery substance inside it.[3]  Detective Markwald recognized this as a "tooter," commonly used slang for something used to aide in ingesting controlled substances through nasal insufflation (snorting).

18.  Next to the straw was a single credit card.  Detective Markwald recognized this as an item often used by people "cutting" powder-based controlled substances.  The term

---

[3] DEA Laboratory analysis determined that the white powdery substance was cocaine and fentanyl residue.

"cutting" refers to the use of a thin-edged item to crush, dice, and separate a powder-based controlled substance into small thin fine lines to aide in ingestion.

19.   Detective Markwald walked around to the end of the counter and noticed there was water on the countertop near the credit card.  The water looked to him as if someone wiped the top of the counter down as the water was streaked and not in drops or puddled.  Detective Markwald further observed a white powder like substance on the floor and floor rug.  The powder was strewn about a large area of the floor.  Due to the water streaks on the countertop above the floor where the powder like substance was located, it appeared to Detective Markwald that someone had attempted to clean the powder substance off of the countertop.  Detective Markwald did not see any additional drug paraphernalia or controlled substances in any other rooms within the Diamond Avenue Residence.

20.   Also, on the countertop was S.H.'s red iPhone 11 in a clear case and with a lock screen picture of E.H., **SUBJECT DEVICE 4.**

   *d.*   ***Crime Scene Investigators, Orange County Health Emergency Response Specialist, and Deputy Coroner's Initial Observations and Examinations***

21.   On October 25, 2021, at 4:12 p.m., Detective Fletcher obtained a signed search warrant from the Honorable Judge Prickett, Harbor Justice Center, Department H-2, Superior Court for the State of California, County of Orange.  This warrant ordered the search of the Diamond Avenue Residence.  NBPD Crime

Scene Investigation ("CSI") arrived on scene and assisted with the collection of evidence and processing the scene.

22.  Once the scene was documented and evidence collected, Orange County Health ("OCH") Emergency Response Specialist S. Hansen-Brooks arrived on scene to assist.  Due to the presence of suspected fentanyl, OCH Specialist Hansen-Brooks entered and utilized a chemical agent on all surfaces where the substance suspected to be fentanyl was likely present.  OCH Specialist Hansen-Brooks sprayed all the decedents hands, faces, and other areas of the body where residual fentanyl could have remained.[4]

23.  Once the hazardous material response was complete, Deputy Coroner M. Hartney arrived on scene and began her investigation of the three decedents.  Deputy Coroner Hartney found that none of the three decedents had any signs of physical trauma or injury.  Deputy Coroner Hartney found a small plastic baggie located in A.A.'s right front pants pocket.  This plastic baggie was approximately two inches square, black and gold on one side, and had residue of a white powdery substance in it.[5]

B.  **Observations from Surveillance Video Recordings**

24.  On February 3, 2022, I reviewed a NBPD report written by Detective Kyle Markwald dated November 5, 2021.  Based on my

_____

[4] OCH Specialist Hansen-Brooks stated the chemical agent utilized to render the fentanyl inert would likely cause a chemical change to the substance and she was unsure if any samples taken from a sprayed area would test positive as fentanyl in a lab setting.

[5] On February 3, 2022, I reviewed a DEA lab report which indicated that the bag found in the front pocket of A.A. was determined to contain cocaine and Phenyltetrahydroimidazothiazole (a common cutting agent for cocaine).

review of the report and viewing of screenshots of surveillance
video, I am aware, in relevant part, of the following: On
Monday, October 25, 2021, Detective Gamble assisted with an area
check of the alleys adjacent to the Diamond Avenue Residence.
Detective Gamble located a camera to the rear of 806 S. Bay
Front facing the Diamond Avenue Residence.  The surveillance
camera was mounted above the garage of 806 S. Bay Front, Newport
Beach, California, and faced northwest.  The camera's field of
view captured the alleyway intersection as well as the lower
section of the flight of stairs servicing the Diamond Avenue
Residence.  Detective Gamble verified the time and date of the
surveillance footage was accurate when it was downloaded.

25.  On February 3, 2022, I reviewed screenshots of the
surveillance video referenced above.  Based on my review of the
screenshots, I observed an individual with similar physical
characteristics to DICK walking into view of the camera at
approximately 7:50 a.m.; then at approximately 8:02 a.m., a grey
Ford Explorer, bearing California license plate 8TJR221, is seen
in the alleyway.[6]  As discussed above, during his interview at
Hoag Hospital, E.H. stated the male who delivered the controlled
substances to the residence was driving a Ford Explorer.

C.   **NBPD SEARCH OF SUBJECT DEVICE 1**

26.  On February 4, 2022, I reviewed a NBPD report written
by Detective Kyle Markwald dated November 4, 2021.  Based on my
review of the report, I am aware, in relevant part, of the

---

[6] As discussed below, a California Department of Motor
Vehicles records check confirmed that this vehicle was
registered to DICK.

following: On Wednesday, October 28, 2021, Detective Markwald received a signed search warrant from the Honorable Judge Prickett, Harbor Justice Center, Dept. H2, Superior Court for the State of California, County of Orange.  This warrant ordered the search of D.A.'s Porsche, which had been removed from the Diamond Avenue Residence, and the four cellular phones located within the residence, **SUBJECT DEVICES 1-4**.

27.  Detective Markwald began searching **SUBJECT DEVICE 1**, a black iPhone 8 located on the coffee table in the front room of the residence, and the combination provided by E.H. during his interview unlocked and opened the phone.  During the search of the phone, in relevant part, Detective Markwald obtained the following information:

a.  **SUBJECT DEVICE 1** was named E.H. with a corresponding email address and had an assigned photograph displaying E.H. and his wife, S.H.  For this reason, Detective Markwald believed the phone was E.H.'s and the device was used to arrange the purchase of the "cocaine" that likely contained fentanyl.

b.  Detective Markwald reviewed messages on **SUBJECT DEVICE 1** and found the last thread utilized on Sunday, October 24, 2021, was with a contact titled "[D.L.]" and associated phone numbers of (949) 903-6919 and (949) 903-3720.[7]

_____

[7] On February 3, 2022, I reviewed subscriber information provided by T-Mobile pursuant to an administrative subpoena. Based on my review of the records received from T-Mobile, I know that the phone numbers (949) 903-6919 and (949) 903-3720 are subscribed to D.N. at 2915 Red Hill Avenue, C103, Costa Mesa, California 92626.

      c.   The entire conversation took place on Sunday, October 24, 2021; it read:

- **(10:32 a.m.) E.H.:** At the g string bar
- **(8:39 p.m.) D.N.:** Im at the Hollywood house tonight but at a movie so I can't answer.  I have to drop off a check im down town LA at 8am so I figured I would just stay up here for the night to beat traffic.
- **(8:40 p.m.) E.H.:** (emoji thumbs up)
- **(8:41 p.m.) E.H.:** Will homie come to Newport
- **(8:42 p.m.) D.N.:** Billy prob will but not Brian
- **(8:42 p.m.) D.N.:** (shared contact titled Billy DD)
- **(8:45 p.m.) D.N.:** That bag is still sitting on the kitchen counter from last night too.  Go grab that

      d.   Detective Markwald then reviewed the contact information shared by D.N., titled "Billy DD", later identified as William Edward DICK, Jr., ("DICK") as discussed below in paragraph 29, and had an associated phone number of (602) 295-8067.  Detective Markwald located a text thread between E.H.'s phone and DICK that began immediately after D.N. shared the contact number.  The conversation took place on Sunday, October 24, 2021; it read:

- **(8:45 p.m.) E.H.:** Sup bud it's D[]'s cousin can you cruise to Newport
- **(8:51 p.m.) DICK:** Where?

- **(8:53 p.m.) E.H.:** 106 Diamond Ave balboa island
- **(8:59 p.m.) E.H.:** $200
- **(9:05 p.m.) E.H.:** Ya?
- **(9:11 p.m.) DICK:** Yeappers. On my way in about 8 mins. How is the parking,
- **(9:14 p.m.) E.H.:** We're up stairs cruise up we'll be out front
- **(9:28 p.m.) DICK:** Ok
- **(9:36 p.m.) DICK:** I'm heading your way
- **(9:55 p.m.) DICK:** I'm here
- **(9:57 p.m.) E.H.:** Where?

e.   There was no response after DICK stated he arrived until the morning of Monday, October 25, 2021, at 10:45 a.m. when DICK texted, "Morning, how are you feeling." It should be noted that the general media did not arrive on scene until 10:37 a.m. and had not broadcasted information about the overdoses at the time of DICK's text Monday morning. Accordingly, this suggests DICK had knowledge of the overdoses at the residence and was checking on the welfare of E.H.[8]

f.   Based on my review of the above referenced conversations involving E.H., D.N., E.H., and DICK on the evening October 24, 2021, I believe that E.H. contacted D.N. in order to procure "$200" worth of drugs, which E.H. believed to be cocaine. When D.N. replied "Billy prob will but not Brian," and subsequently shared contact information for "Billy DD," I

---

[8] As discussed in paragraph 25 above, DICK's Ford Explorer was captured on surveillance video leaving the area of the Diamond Avenue Residence around 8:02 a.m.

believe that D.N. was sharing the contact information for DICK. I believe that D.N. was instructing E.H. to contact DICK, a narcotics source, instead of "Brian," who I believe is another narcotics source.  Furthermore, I believe that D.N. brokered the narcotics transaction that led to the delivery of fentanyl by DICK, which was subsequently ingested by E.H., S.H., A.A., and D.A., and resulted in the overdose deaths of S.H., A.A., and D.A.

**D.    Identification of DICK and Connection to 602-295-8067 and SUBJECT DEVICE 5**

28.  On February 4, 2022, I reviewed a NBPD report written by Detective Kyle Markwald dated November 4, 2021.  Based on my review of the report, I am aware, in relevant part, of the following:

29.  Detective Markwald researched the phone number (602) 295-8067 and found it was a Verizon controlled line subscribed by DICK, associated with **SUBJECT DEVICE 5**.  Based on Detective Markwald's review of law enforcement databases, DICK had provided this number to law enforcement on several occasions. These contacts occurred between October 2013 and November 2019.[9]

30.  Detective Markwald then reviewed California Department of Motor Vehicles ("DMV") records for DICK, which indicated DICK's residential address was 3298 Turlock Drive, Costa Mesa, California ("the Turlock Residence") as of September 29, 2020. A DMV records query indicated that DICK has a grey 2020 Ford

---

[9] Three contacts were speeding tickets and two contacts related to field interviews which occurred while DICK was wearing a vest emblazoned with "Devil's Diciples" insignias. The Devil's Diciples is a known Outlaw Motorcycle Gang.

Explorer with a license plate of 8TJR221 ("DICK's grey Ford Explorer") registered to him at the Turlock Residence.

**E.   Search Warrant for the Turlock Residence and Interview of DICK and B.M.**

31.   On February 4, 2022, I reviewed a NBPD report written by Detective Markwald, dated November 5, 2021.  Based on my review of the report, I am aware, in relevant part, of the following regarding the execution of a California state search warrant at the Turlock Residence:

32.   On Thursday October 28, 2021, at 6:28 a.m., NBPD detectives conducted surveillance at the Turlock Residence and observed DICK's grey Ford Explorer parked in the driveway.

33.   On the same day, Detective Markwald obtained a search warrant from the Honorable M. McCartin, Judge, Superior Court for the State of California, County of Orange.  The warrant authorized the search of DICK, DICK's grey Ford Explorer, DICK's cellphone service provider, DICK's cellphone (**SUBJECT DEVICE 5**), and DICK's residence, the Turlock Residence.

34.   At approximately 4:54 p.m., DICK returned to the Turlock Residence with his girlfriend, B.M., in her vehicle.  At that time, NBPD detectives detained DICK and B.M.

   *a.   Interview of DICK.*

35.   Detective Markwald responded to the Turlock Residence and explained to DICK that he was not under arrest and subsequently interviewed DICK.  The interview was audio recorded and in relevant part, DICK made the following statements:

a.    DICK stated that at some point on October 24, 2021, DICK's friend "Dave" asked him to come to Newport Beach, California to party.  DICK had initially met "Dave" at a bar approximately three months prior and did not know "Dave's" last name.  DICK had contacts with "Dave" saved in his cellular telephone (**SUBJECT DEVICE 5**).

b.    DICK arrived at the Diamond Avenue Residence at approximately 11:00 p.m. and saw "Dave," two females, and two males that he did not know.

c.    DICK noticed that there was a tray on the coffee table that had a white powdery substance he believed was cocaine.

d.    DICK did not see anyone ingesting cocaine at any time.  DICK himself did not ingest any controlled substances as he was "trying to get off that."

e.    At some point in the evening, DICK smoked marijuana from a pipe that someone passed him.  DICK stated it tasted and smelled like marijuana but must have been strong as he felt tired after.  One of the males who smoked with DICK was very inebriated and fell asleep on the ground by the coffee table at this time.[10]  After smoking the marijuana, DICK was not feeling well and subsequently fell asleep in the kitchen area.

f.    On October 25, 2021, at approximately 6:30 a.m., DICK was not feeling well, so he gathered his belongings and

---

[10] I believe that this is a reference to A.A. who was found by emergency personnel deceased lying near the coffee table.

left.  As he was leaving, DICK saw one person on the couch raise their hand and make a hang loose hand gesture.[11]

g.   When confronted about the text messages found on **SUBJECT DEVICE 1**, referenced above in paragraph 27.d, DICK stated that he brought one gram of cocaine to the Diamond Avenue Residence and sold it to "Dave" on the evening of October 24, 2021.  "Dave" requested the cocaine over text message and agreed to pay $200 but DICK only charged $100 and "Dave" paid in cash. DICK stated that the small baggie located in his garage was from the same supply he had delivered to "Dave" (discussed below in further detail in paragraph 41.c).

h.   DICK sold cocaine to "Dave" approximately three times in the past and never had a problem before.

i.   DICK's cocaine source of supply ("SOS") lives in the Corona, California area, near Interstate 15 and Magnolia. DICK does not have any way to communicate with his cocaine SOS and would typically just drive to the location and obtain two to three grams of cocaine at a time.

j.   DICK admitted to using cocaine and methamphetamine in the past.

36.   During the interview, DICK consented to a search of his cellular telephone (**SUBJECT DEVICE 5**) and unlocked the device.

a.   During the search of **SUBJECT DEVICE 5**, Detective Markwald was unable to located any text messages with "Dave";

---

[11] Detective Markwald noted that D.A. was found deceased sitting on the couch, D.A.'s right arm was still in an upright position while holding an electronic cigarette.

additionally, **SUBJECT DEVICE 5** only had six (6) total logged phone calls, all of which occurred on October 27, 2021.

       b.   Detective Markwald confronted DICK about why **SUBJECT DEVICE 5** did not have the corresponding text thread located on **SUBJECT DEVICE 1** (referenced above in paragraph 27.d). DICK stated that his phone had "been acting weird" and could have deleted on its own.

     37.  Based on the information outlined above, I believe that DICK supplied the cocaine and fentanyl to E.H. at the Diamond Avenue Residence after E.H. contacted DICK on **SUBJECT DEVICE 5** to order $200 worth of cocaine.

     38.  Furthermore, the lack of text messages and calls on **SUBJECT DEVICE 5** lead me to believe that DICK was not forthcoming and truthful in the information he provided in this interview and was actively trying to conceal information that pointed to his involvement. Specifically, DICK initially told Detective Markwald that he had just gone to the Diamond Avenue Residence to party and that he saw a white powdery substance on a tray on the coffee table when he arrived. Notably, this detail matched a new detail in a subsequent interview of E.H. at NBPD; also notable is that based on geolocation data from **SUBJECT DEVICE 5**, late in the evening on October 26, 2021, DICK met with D.N., an attorney believed to have represented DICK in the past and who represented E.H. during E.H.'s subsequent interview. Based on my review of Detective Markwald's report and conversations with others involved in this investigation, no such tray with powder on it was present at the Diamond Avenue

Residence on the morning of October 25, 2021, when NBPD arrived. It was not until DICK was confronted about the text messages referenced above from **SUBJECT DEVICE 1** that he admitted to selling 1 gram of cocaine to "Dave" on October 24, 2021.  I believe that "Dave" is actually a reference to D.N. or E.H., as the corresponding text messages from **SUBJECT DEVICE 1** demonstrate.  In sum, I believe that DICK was attempting to conceal his involvement by deleting text messages and phone calls and fabricating the existence of a tray of cocaine being present at the Diamond Avenue Residence.

   *b.  **Interview of DICK's girlfriend B.M.***

   39.   After concluding his conversation with DICK, Detective Markwald went to the backyard, where DICK's girlfriend, B.M., had been waiting with Detective Aguilar.  When Detective Markwald got to the backyard, B.M. was seated at a table, was not handcuffed, and was told that she was not under arrest. Detective Markwald informed B.M. that investigators were serving a search warrant related to a multiple overdose incident in Newport Beach and asked if he could obtain her statement.  The interview was audio recorded and in relevant part, B.M. made the following statements:

   a.   B.M. had not used narcotics in approximately 3 months but had previously used cocaine and methamphetamine.

   b.   B.M. stated that both DICK and herself were not currently employed, but that DICK also received money from disability.

c.   DICK told B.M. that he was going to Newport Beach on Sunday, October 24, 2021, but did not say who he was meeting or why he was going there.

d.   B.M. called and texted DICK several times throughout Sunday evening, but did not hear from DICK again until approximately 8:30 a.m. on Monday, October 25, 2021.

e.   B.M. consented to a search of her phone, and unlocked the phone for investigators.

f.   B.M. only knew of one person named "Dave" associated with DICK, and that person was D.N., who was DICK and B.M.'s lawyer.

g.   B.M. had only ever seen DICK use methamphetamine and cocaine.  DICK complained on the morning of October 25, 2021, that he was not feeling well.

40.  Investigators collected all the evidence seized pursuant to the warrant and Detective Markwald took custody of DICK's and B.M.'s cellular phones, **SUBJECT DEVICE 5 and SUBJECT DEVICE 6**, as they both stated there were communications between them regarding DICK and the Diamond Avenue Residence.

### c.   *Evidence seized from the Turlock Residence and DICK's grey Ford Explorer*

41.  On February 3, 2022, I reviewed NBPD Detective Mike Fletcher's supplemental report dated November 5, 2021, regarding evidence seized from the Turlock Residence.  Based on my review of that report, in relevant part, I am aware that investigators seized the following evidence:

a.   In the bottom drawer of a white tool chest located against the north wall of the garage were three digital gram scales, two plastic spoons with an unknown white residue, and a small clear zip-loc baggie.

b.   In the top drawer of an orange tool chest located against the north wall of the garage were numerous clear zip-loc baggies commonly used for packaging narcotics.  In the bottom drawer of the orange tool chest, inside a "VIDIVI" box investigators found similar plastic zip-loc baggies.

c.   In the right bottom door jamb of a gray cabinet affixed to the north wall of the garage, above the orange tool chest, was a single clear zip-loc baggie containing an unknown white powder residue.  This baggie was located in the place where DICK told Detective Markwald the narcotics he possessed would be found.[12]

d.   In a plastic storage container under the bed in the master bedroom was a chrome .38 revolver, inside of a holster and wrapped in a plastic bag.  The serial number on the revolver had been obliterated.

e.   Inside a green tote bag located in the walk-in closet in the master bedroom investigators found a .22 caliber AR-style pistol.  The pistol bore no serial number.  Also inside the green tote bag were three .22 caliber AR-style magazines, all containing live ammunition.  Finally, also in the green tote

---

[12] DEA Southwest Laboratory analyzed the substance inside this bag and determined it to be cocaine.

bag was a clear bag containing numerous small clear zip-loc baggies.

f.   Inside the top left drawer of a closet organizer inside the walk-in closet in the master bedroom was a sandwich bag containing a large quantity of a white powder like substance.  The bag had the words "baby powder" handwritten on it in black marker.[13]

g.   Inside the top right cabinet of the closet organizer inside the walk-in closet in the master bedroom were loose rounds of .22 caliber live ammunition.

h.   Inside the center console of DICK's grey Ford Explorer were small zip-loc baggies.  Among these were eleven 1" x 1" plastic zip-loc baggies that were clear on one side and black with gold skulls on the other side.  The markings on theses baggies were identical to that of the single 2" x 2" baggie that was discovered inside victim A.A.'s pants pocket during the Coroner's examination.

i.   Under the front passenger floor mat of DICK's vehicle was a clear plastic bag[14] containing two smaller clear

---

[13] DEA Southwest Laboratory analyzed the substance inside the bag.  I have reviewed the report of that analysis, and based on that report, the baggie contained no controlled substances. Based on my training and experience, I know that white powder substances that are not controlled substances are often used by narcotics dealers to dilute or "cut" controlled substances before distribution.  By "cutting" controlled substances with inexpensive, non-controlled substances, narcotics distributors can increase their profits from sales.

[14] DICK stated his friends "Carrie" and "Jack" borrowed the vehicle when he was staying with them.  DICK stated "Carrie" and "Jack" both used fentanyl and could have left it in his vehicle. Detective Markwald verified with DICK that DICK was the only driver of the vehicle in the last month.

plastic zip-loc baggies that each contained a white powder like substance.  One baggie was marked with black marker, "7.3 F"[15] and the other was marked with black marker, "1 F".

       j.   In the driver's door compartment of DICK's vehicle were two additional 1" x 1" plastic zip-loc baggies that were clear on one side and black with gold skulls on the other. Additionally, investigators located a plastic container holding a single razor blade[17] and a Theodore Robbins insurance invoice in DICK's name.

       k.   In addition to the items seized from the Turlock Residence and DICK's grey Ford Explorer, NBPD officers also seized a blue Apple iPhone, **SUBJECT DEVICE 5**, that was taken

---

[15] DEA Laboratory analysis of both baggies revealed that the baggies collectively contained approximately 7.78 grams of N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl]propanamide (Fentanyl).

    Based on my training and experience, I know that a single gram baggie is the most commonly purchased weight by an end user when referring to cocaine, fentanyl, and heroin.  Depending on a person's size, weight, tolerance, and average daily usage, a single use of fentanyl purchased on a "street level" is approximately 0.1-0.2 grams.  Accordingly, the approximately 7 grams found in DICK's vehicle would equate to approximately 40-70 single uses.  Based on this knowledge of "street level" fentanyl use, the presence of narcotics packaging, and DICK's and B.M.'s statements that they do not use fentanyl, I believe that the baggies found in DICK's car were intended for distribution.

[17] Through my training and experience, I recognized these items together as being indicative of possession of controlled substances with the intent to distribute.  Through previous investigations, speaking with other law enforcement officers and agents, talking to self-admitted drug users and people arrested for sales of controlled substances, I know it is common for a person to purchase a bulk amount of a controlled substance and then separate, weigh, and package the controlled substance in smaller plastic baggies for sales to the end users.

from DICK, and a black Samsung cellphone, **SUBJECT DEVICE 6**, from B.M.

**F.   Interview of E.H. with D.N. present at NBPD**

42.   On February 4, 2022, I reviewed a NBPD report written by Detective Kyle Markwald dated November 4, 2021.  Based on my review of the report, I am aware, in relevant part, of the following:

43.   On October 31, 2021, at approximately 11:15 a.m., E.H. arrived at the Newport Beach Police Department to retrieve his wallet and S.H.'s personal belongings, and to speak with Detective Markwald.  Present with E.H. for his interview was D.N., who presented himself as E.H.'s attorney[18] and provided Detective Markwald with the phone number of (949) 903-3720.[19] The interview was audio recorded and, in relevant part, E.H. made the following statements:

a.   E.H. generally recounted the events of the evening of October 24, 2021, and did not provide any further details regarding the groups whereabouts prior to returning to the Diamond Avenue Residence.

_____

[18] As noted above, B.M. told Detective Markwald that D.N. was her and DICK's attorney.

[19] This phone number matched the number for the "[D.L.]" contact saved in E.H.'s phone.  This was also the phone number for the "[D.L.]" who helped E.H. procure controlled substances from DICK on October 24.  As described above, the text conversation reflected that "[D.L.]" told E.H. that "Brian" would not be able to meet him but "Billy" could.  "[D.L.]" then provided "Billy's" phone number to E.H.  The contact for "Billy" matched DICK's phone number.  E.H. then contacted DICK and arranged for the purchase of cocaine.

b.   E.H. stated when he and S.H. arrived at the Diamond Avenue Residence, he observed a large tray with cocaine on it.

c.   E.H. stated that he did not order any cocaine on the night of October 24, 2021.

d.   When confronted about text messages on **SUBJECT DEVICE 1** (E.H.'s cellular telephone), in which E.H. was actively attempting to order cocaine, E.H. stated that when he drinks he calls many people.  He also stated that he frequently blacks out when he drinks.

e.   E.H. denied knowledge of any controlled substance that "Billy" might have brought to the Diamond Avenue Residence on October 24, 2021.  E.H. stated that all drug use occurred before "Billy" arrived.

44.  Based on the statements above, I believe that E.H. made false statements.  Specifically, E.H.'s prior statement at the hospital on October 25, 2021, indicated that he had contacted "Billy DD" (DICK) in regard to purchasing cocaine, a statement which was consistent with the text messages observed on E.H.'s cellular telephone.  Now, E.H. was stating that he did not arrange to purchase narcotics from DICK, and that all drug use at the Diamond Avenue Residence on October 24 occurred before DICK arrived.  Further, E.H.'s story changed to include a particular new detail: namely, that when E.H. and S.H. arrived at the Diamond Avenue Residence on October 24, drugs were already present in the form of a white powdery substance on a tray on the coffee table.  This previously unmentioned detail

matches the false account DICK gave about drugs being present when he arrived, a statement which I believe DICK made after meeting with D.N.  In sum, I believe E.H. and DICK both fabricated the account of there being controlled substances present on a tray at the Diamond Avenue Residence, after both had met with D.N.

G.   **DEA Search of SUBJECT DEVICES 1 through 6**

45.  On February 14, 2022, the Honorable Karen E. Scott, United States Magistrate Judge, signed a search warrant for six telephones, including DICK's phone (**SUBJECT DEVICE 5**) and B.M.'s phone (**SUBJECT DEVICE 6**).

46.  On April 4, 2022, DEA executed the search warrant on **SUBJECT DEVICES 1** through **6**.

47.  Although the text message conversation between DICK and E.H. were missing from **SUBJECT DEVICE 5, SUBJECT DEVICE 5** (DICK's cellular telephone) still contained evidence of narcotics possession and distribution.  For example, there are several photographs on **SUBJECT DEVICE 5** depicting various narcotics, including narcotics that appear to be packaged for distribution to others, as well as drug paraphernalia.  Based on metadata retrieved from the photographs, these photographs were taken between September 6, 2021 and September 16, 2021.

48.  Review of **SUBJECT DEVICE 5** also revealed that DICK searched the Internet for the phrases "how to check the purity of cocaine," and "where to buy a cocaine test kit," late on the evening of October 24, 2021.

49.  **SUBJECT DEVICE 5** also contained messages between DICK and other individuals referencing the distribution and purchase of narcotics.

50.  **SUBJECT DEVICE 6**, B.M.'s phone, contained messages between B.M. and DICK on the morning of October 25, 2021. During that conversation, at approximately 7:45 a.m., DICK sent a message to B.M. saying, "This where I'm at" with a pin drop, or a tagged geolocation, at the location of the Diamond Avenue Residence.

### V.  CONCLUSION

51.  For all of the reasons described above, there is probable cause to believe that DICK violated 21 U.S.C. §§ 841(a)(1), (b)(1)(C): Distribution of Fentanyl Resulting in Death.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 20 day of
April, 2022.

_____
HONORABLE JOHN D. EARLY
UNITED STATES MAGISTRATE JUDGE